NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 7

No. 22-AP-162

| | |
|---|---|
| K.C. Myers | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Civil Division |
| | |
| Jim Baker et al. | October Term, 2022 |

Robert A. Mello, J.

Matthew F. Valerio, Defender General, and Annie Manhardt, Prisoners' Rights Office, Montpelier, for Plaintiff-Appellant.

Susanne R. Young, Attorney General, Montpelier, and Patrick T. Gaudet, Assistant Attorney General, Waterbury, for Defendant-Appellee.

PRESENT: Eaton, Carroll, Cohen and Waples, JJ., and Johnson, J. (Ret.), Specially Assigned

¶ 1. **WAPLES, J**. In this interlocutory appeal, petitioner K.C. Myers challenges the trial court's determination that his exclusion from the earned-time program for a disqualifying offense did not violate the Ex Post Facto Clause of the U.S. Constitution. The central question in this appeal is whether the effective date of the earned-time program or the enactment date of the statute mandating its creation controls for the purposes of an ex-post-facto analysis. Because we agree with the trial court that the program's effective date controls, and, therefore, petitioner's disqualification from the program did not offend the U.S. Constitution's prohibition on ex-post-facto laws, we affirm.

¶ 2.     The following facts are undisputed.  On June 10, 2019, the Governor signed into law a bill amending 28 V.S.A. § 818 and requiring the Vermont Department of Corrections (DOC) to promulgate regulations establishing an earned-time program no later than July 1, 2020.  This original earned-time bill made findings of purpose and enumerated the specific parameters that the Legislature expected to be implemented by the DOC regulations, including the amount of earned time and the circumstances under which an offender would earn time.  See 2019, No. 56, §§ 1-9. The program contemplated by this bill was not established, however, as the DOC did not promulgate the regulations required to make the program effective by the July 1 deadline.  The Legislature enacted another earned-time bill, see 2019, No. 148 (Adj. Sess.), § 14, which extended the deadline for the DOC to promulgate regulations to September 1, 2020, and explicitly made the program effective on January 1, 2021.  This new bill also increased the amount of earned-time credit received by offenders meeting the criteria from five days per month to seven days per month if the offender was not adjudicated of a major disciplinary violation or reincarcerated from the community for a violation of release conditions.[1]  See id.

¶ 3.     Petitioner was accused of committing burglary on August 17, 2019, almost two months after the original earned-time bill, 2019, No. 56, §§ 1-9, was signed into law.  He was arraigned in March 2020 and pled no contest on May 12, 2020, receiving a two-to-five-year prison sentence.  Petitioner was serving a suspended sentence for lewd and lascivious conduct with a child when he received the burglary sentence.  Petitioner, like all others in prison meeting the standards set forth in 2019, No. 148 (Adj. Sess.), § 14, became eligible for earned time starting on

---

[1]  Various terms are used to refer to the time subtracted from an offender's sentence depending on how that time is calculated and awarded, including "gain time," "earned time," and "good time."  For consistency, such time will be referred to as "earned time" throughout this opinion.

January 1, 2021. Id. He earned a total of thirteen days off each of his sentences for the months of March and April 2021.[2]

¶ 4. The earned-time program was again amended by 2021, No. 12, § 2, which became effective on April 26, 2021. This act resulted in the current iteration of 28 V.S.A. § 818, which reads:

> Notwithstanding 1 V.S.A. § 214, an offender who was serving a sentence for a disqualifying offense on January 1, 2021 shall not earn any earned time sentence reductions under this section after the effective date of this act. This subdivision (5) shall not be construed to limit or affect earned time that an offender has earned on or before the effective date of this act.

28 V.S.A. § 818(b)(5). Among the offenses disqualifying an offender from receiving earned time is lewd and lascivious conduct with a child. Id. § 818(c)(1)(D). On June 12, 2021, the DOC promulgated the regulations mandated by the 2021 law. Earned Time Rule, Code of Vt. Rules 13 130 013, http://www.lexisnexis.com/hottopics/codeofvtrules. Like § 818(b)(5), the regulations make offenders serving a sentence for a disqualifying offense on or after January 1, 2021, ineligible for earned time after April 26, 2021. Id. § III(B)(2).

¶ 5. These changes rendered petitioner ineligible to earn any additional time off his maximum sentence for either offense, although he did not lose any previously granted earned time. Petitioner filed a claim in the civil division challenging the implementation of the earned-time program claiming violations of the Common Benefits Clause of the Vermont Constitution and the Ex Post Facto and Due Process Clauses of the U.S. Constitution. He then moved for partial summary judgment on the ex-post-facto claim alone, and the State responded with a cross-motion on that claim. The civil division granted the State's partial summary-judgment motion concluding that petitioner suffered no ex-post-facto violation.

---

[2] Because the act disqualifying petitioner from earned-time, 2021, No. 12, § 2, went into effect on April 26, 2021, the earned-time that petitioner received for the month of April 2021 was prorated, resulting in him receiving only six days off each of his sentences for that month.

¶ 6.    In evaluating petitioner's claim, the civil division applied the test set forth in Weaver v. Graham, asking first whether the law in question was retrospective, and second, whether it had disadvantaged the offender affected by it.  450 U.S. 24, 29 (1981).  The court concluded that the only relevant dates for determining whether the law was retrospective were (1) the date of the offense and (2) the date that the earned-time program went into effect.  The court rejected petitioner's argument that the date on which the initial law, 2019, No. 56, §§ 1-9, was enacted was the proper date for determining retrospective application.  It opined that although the Legislature had directed the DOC to establish an earned-time program some two months before petitioner's offense, there was no indication that the DOC proposed or adopted such a program before petitioner committed his offense on August 17, 2019.

¶ 7.    The trial court went on to conclude that the program became effective on January 1, 2021, as required by 2019, No. 148 (Adj. Sess.), § 14.  Thus, there could be no ex-post-facto violation because no program was in effect at the time of petitioner's offense.  The trial court therefore granted summary judgment to the State on the ex-post-facto claim.  Petitioner then filed a motion for reconsideration, requesting additional briefing on the difference between the enactment date of the statute and the effective date of the program.  The trial court denied the motion.  This Court accepted petitioner's subsequent request for an interlocutory appeal from the partial summary-judgment decision on the ex-post-facto claim.

¶ 8.    We review a grant of summary judgment by applying the same standard as the trial court, "affirming the judgment only when the moving party has demonstrated that there are no genuine issues of material fact and the party is entitled to judgment as a matter of law, and resolving all reasonable doubts in favor of the party opposing the motion."  Smith v. Parrott, 2003 VT 64, ¶ 6, 175 Vt. 375, 833 A.2d 843; see V.R.C.P. 56(a) (providing standard for summary judgment).

4

¶ 9.     "The ex post facto prohibition forbids the Congress and the States to enact any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed."  Weaver, 450 U.S. at 28 (quotation and footnote omitted).  "Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed."  Id. at 28-29.  "To fall within the ex post facto prohibition, a law must be retrospective—that is, 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it' by altering the definition of criminal conduct or increasing the punishment for the crime."  Lynce v. Mathis, 519 U.S. 433, 441 (1997) (citation omitted) (quoting Weaver, 450 U.S. at 29).

¶ 10.     "[A] law need not impair a vested right to violate the ex post facto prohibition."  Weaver, 450 U.S. at 29 (quotation marks omitted).  "Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated."  Id. at 30.  "Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense."  Id. at 30-31.  In his opinion in Calder v. Bull, Justice Chase distilled four categories of provisions which violate the Ex Post Facto Clause:

> 1st.  Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action.  2nd.  Every law that aggravates a crime, or makes it greater than it was, when committed.  3rd.  Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.  4th.  Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

3 U.S. 386, 390 (1798).

¶ 11.    The U.S. Supreme Court first applied the Ex Post Facto Clause to prison earned-time credits in Weaver.  There, the offender availed himself of a Florida program in effect at the time of his offense which allowed him to earn reductions in his sentence for good conduct.  The program was amended two years later, reducing the amount of time the offender could earn off his sentence every month.  The offender challenged the amended statute as a violation of the Ex Post Facto Clause and the Court agreed.  Id. at 27, 36.  First, the Court held that the statute applied retrospectively to the offender even if it was not contemplated in the original sentence because "it alter[ed] punitive conditions outside the sentence."  Id. at 32.  Next, the Court held that the statute disadvantaged the offender because it prevented him from "shorten[ing] his time in prison simply through good conduct."  Id. at 33-34.  The Court stressed that because a vested right need not be impaired, even alteration of penal provisions "accorded by the grace of the legislature" can violate the Ex Post Facto Clause.  Id. at 30-31.

¶ 12.    The Court would further clarify the application of the ex-post-facto analysis to earned-time credits in Lynce, where an offender was rearrested after five years' worth of provisional credits were retroactively cancelled by the Florida Legislature.  Prior to the commission of the offense at issue in Lynce, Florida had enacted a statute requiring earned-time credits to accrue to offenders when the prison population reached 98% of capacity.  Later modifications not only altered the triggering threshold for the program's effectiveness but made the award of earned-time credits discretionary as opposed to mandatory.  The Court determined that the purpose behind the statute's retroactive application was irrelevant and that it was not required to be "in some technical sense part of the sentence."  519 U.S. at 445.  It rejected the contention that the offender's disadvantage was "speculative and attenuated" by pointing to the concrete disadvantage he suffered—his reincarceration.  Id. at 446-47.

¶ 13.    Petitioner likens his circumstances to the petitioners in both Weaver and Lynce, asserting that, as in those cases, modifications to the earned-time statute disqualifying him from

6

the program are both retrospective and disadvantageous to him. However, the primary distinguishing factor between petitioner's claim and those made in Weaver and Lynce can be distilled into the decisive legal question here: for purposes of an ex-post-facto analysis, does the effective date of a program or the enactment date of the statute mandating its creation control? The trial court determined that the former was the proper touchstone, which would not entitle petitioner to relief under the Ex Post Facto Clause. It is irrelevant, petitioner contends, that the State did not implement the earned-time program contemplated by 2019, No. 56, §§ 1-9, because regardless of whether the program ever came to be, the statute on the date of petitioner's burglary offense was different than the one ultimately controlling his earned-time credits.

¶ 14. Petitioner cites Lynce, suggesting that it presents a similar factual scenario in which an offender prevailed on an ex-post-facto challenge where the credits he earned were the result of a statute enacted after his imprisonment. But this is a mistaken reading of the facts in Lynce. Unlike here, in Lynce, there was an earned-time program enacted in 1983, three years before the petitioner in that case committed his offense. The Lynce petitioner challenged the modification of the statute, entitling him to more earned time than was allowed under the 1983 statute. The Court determined that a 1992 statute cancelling the petitioner's earned time, including time earned under the more generous statutes, violated the Ex Post Facto Clause, even where the calculations were based on a variety of modifications to the 1983 statute. 519 U.S. at 447-49. In making this determination, the Court emphasized that the modifications did not affect petitioner's core ex-post-facto claim and that he "could have accumulated [earned time] under the [original] provision in much the same manner as he did under the [modified] credits statute." Id. at 449.

¶ 15. Lynce is distinguishable because even though the statutes had been modified, the program itself existed at the time the petitioner committed his offence, with each successive modification merely altering the triggering point. See id. at 447-48 (noting that emergency earned-time program was in effect at time of petitioner's sentence, requiring only that triggering

7

percentage of prison population be reached). The clear continuous statutory scheme governing the earned-time program that existed in <u>Lynce</u> does not exist here. Petitioner understood the difference because he sought to maintain the credits he received under the more generous law, 2019, No. 148 (Adj. Sess.), § 14, even though that statute had not yet been enacted when he committed his offense.

¶ 16. Additionally, the Court in <u>Lynce</u> was persuaded by the successive Florida earned-time statutes being largely part of the same statutory scheme, having no effect on the petitioner's "core ex post facto claim." <u>Lynce</u>, 519 U.S. at 449. In contrast, here, the earned-time act that was in effect at the time of petitioner's offense, 2019, No. 56, §§ 1-9, largely left establishment of the earned-time program to the discretion of the DOC. It was not until after petitioner committed his offense that the Legislature enacted 2019, No. 148 (Adj. Sess.), § 14, which explicitly created an earned-time program on January 1, 2021. As opposed to a continuous statutory scheme, the statutes at issue here provide for limited discretion to create an earned-time program followed by an explicit mandate after that discretion was not exercised by the deadline.

¶ 17. Petitioner further relies on the Florida Supreme Court case <u>Gomez v. Singletary</u>, which he asserts supports his contention that the earned-time program in <u>Lynce</u> was never implemented. 733 So. 2d 499, 501 (Fla. 1998) ("The State never implemented the [earned-time] statute, so no [earned-time] was ever awarded."). This misreads the complicated web of Florida earned-time statutes. It is not that the 1983 earned-time statute was never implemented; rather, it is that the statute had a triggering point of 98% of the prison population, which was never met, so no earned time was ever awarded. See <u>id</u>. at 500.

¶ 18. The facts in <u>Gomez</u> are distinguishable from the facts here because the 1983 Florida earned-time program continuously existed from the date of the offense forward, requiring no additional government action for implementation. In contrast, the Vermont earned-time statute provided discretion to carry out the creation of a mandated program, but did not create the program

8

itself. Because of the discretion afforded to the DOC to implement the program, and without the regulations illustrating its contours, petitioner did not have the "lack of fair notice" required to implicate anything beyond a "speculative and attenuated possibilit[y] of increasing the measure of punishment." Lynce, 519 U.S. at 441, 444 (citations omitted). Further, as the Gomez court notes, "in this case, there was no cancellation of overcrowding credits already awarded. Accordingly, it is at least arguable that the circumstances present in Lynce are not present here." Gomez, 733 So. 2d at 504-05; see Lynce, 519 U.S. at 435-36 (describing how petitioner was released from prison and subsequently re-arrested when statutory modification nullified his earned time).

¶ 19. Petitioner has not cited any binding caselaw supporting the contention that the pertinent date for an ex-post-facto violation is the enactment date of the statute as opposed to the effective date of the program it creates. When petitioner's offense occurred, there was no earned-time program of which he could have availed himself. There was merely a statute directing that such a program be created. Furthermore, the program contemplated by the statute that petitioner cites never came into existence. Here, 2019, No. 56, §§ 1-9, provided only a "speculative and attenuated possibility of producing" an ex-post-facto violation because it required additional government action for the program to become effective. Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 500 (1995). Nor can the later enacted statutes be considered part of a continuous statutory scheme because they resulted in a different program altogether, which was not contemplated by the original earned-time act. Petitioner's claim is therefore "insufficient under any threshold we might establish under the Ex Post Facto Clause." Id. at 508.

¶ 20. While it is true that an ex-post-facto violation may occur even where "a statute merely alters penal provisions accorded by the grace of the legislature," such a program must still be effective at the time of a petitioner's offense for its discontinuance to violate the Ex Post Facto Clause. Weaver, 450 U.S. at 30. This was not the case here, and thus, we agree with the trial court

9

that the subsequent modifications to the earned-time program disqualifying petitioner did not offend the Ex Post Facto Clause of the U.S. Constitution.

Affirmed.

FOR THE COURT:

Associate Justice