732 So.2d 1029 (1998)
Ronald L. MEOLA, Petitioner,
v.
DEPARTMENT OF CORRECTIONS, et al., Respondents.
Terry L. Jones, Petitioner,
v.
Harry K. Singletary, etc., Respondent. James Meadows, Petitioner,
v.
Harry K. Singletary, etc., Respondent.
Nos. 89,982, 90,148 and 90,241.
Supreme Court of Florida.
December 24, 1998.
Rehearing Denied March 9, 1999.
*1030 Ronald L. Meola, pro se, Zephyrhills, Florida, Terry L. Jones, pro se, London, Ohio, and James Meadows, pro se, Canton, Michigan, for Petitioners.
Louis A. Vargas, General Counsel, and Sheron Wells and Judy Bone, Assistant General Counsel, Department of Corrections, Tallahassee, Florida, for Respondent.
HARDING, C.J.
James Meadows and Terry Jones petition this Court for writ of habeas corpus. Ronald L. Meola petitions this Court for writ of mandamus. We have jurisdiction. Art. V, § 3(b)(8), (9), Fla. Const. Since all three cases concern many of the same questions, they have been consolidated for our consideration.
*1031 Petitionersall inmatesallege that the Florida Department of Corrections' refusal to reinstate their previously awarded Provisional Credits violates the Ex Post Facto Clauses of the Florida Constitution and the Constitution of the United States of America. See Art. I, § 10, Fla. Const.; U.S. Const. art. I, § 10. Petitioners Meadows and Meola also allege that the cancellation constitutes a violation of due process. See Art. I, § 9, Fla. Const.; U.S. Const. Amend. 5; Amend. 14, § 1. Meola also alleges an equal protection violation. See Art. I, § 2, Fla. Const.; U.S. Const. Amend. 14, § 1. We find no such violations and deny the petitions.[1]
Jones and Meola were both convicted of murder.[2] Meadows was convicted of armed robbery, false imprisonment, and possession of cocaine. Jones' offense was committed in 1982. Meola and Meadows committed their offenses between June 2, 1986, and February 4, 1987. Meola and Jones lost their credits because the State retroactively made them ineligible for the receipt of Provisional Credits based on their offenses (murder). See § 944.277, Fla. Stat. (1992); Op. Att'y. Gen. Fla. 92-96 (1992).[3] Meadows lost his credits due to a somewhat later across-the-board cancellation of all previously awarded Administrative Gain Time and Provisional Credits. See § 944.278, Fla. Stat. (1993)[4]. The Department of Corrections refuses to reinstate all three petitioners' credits, asserting that the United States Supreme Court decision in Lynce v. Mathis, 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997), does not require the reinstatement of these particular inmates' credits.
Prior to the Supreme Court's recent decision in Lynce, this Court had always held that Administrative Gain Time and Provisional Credits were not subject to the Ex Post Facto Clause because the award of overcrowding gain time was *1032 based on unpredictable prison overcrowding. See Griffin v. Singletary, 638 So.2d 500 (Fla.1994); Dugger v. Rodrick, 584 So.2d 2 (Fla.1991). The decision in Lynce, however, made clear that, like other forms of gain time, prison overcrowding gain time can constitute one determinant of a prisoner's sentence because a "prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." Lynce, 519 U.S. at 445-46, 117 S.Ct. 891 (quoting Weaver v. Graham, 450 U.S. 24, 32, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981)).
The Ex Post Facto Clause is triggered when a law "increases punishment beyond what was prescribed when the crime was consummated." Lynce, 519 U.S. at 441, 117 S.Ct. 891 (emphasis added). The Ex Post Facto Clause attempts to ensure that citizens have prior notice of the consequences of committing a crime before the crime is committed. See generally Laurence H. Tribe, American Constitutional Law § 10-1, at 629 (2d ed.1988)(concerning the protection of the citizenry's reliance on legitimate expectations); see also Gwong v. Singletary, 683 So.2d 109, 112 (Fla.1996)(to violate the Ex Post Facto Clause, a law need only make the punishment more onerous than the law in effect at the time the offense was committed).
In Lynce, the Supreme Court indicated that while the inmate in that case had committed his offense before either the Administrative Gain Time or the Provisional Credits statutes had gone into effect, that fact did not matter because the first overcrowding statute (the 1983 Emergency Gain Time statute) was in effect, and he was eligible under that statute. See § 944.598(c), Fla. Stat. (1983). The Court concluded that the Emergency Gain Time statute, the Administrative Gain Time statute and the Provisional Credits statute were essentially the same thing, at least for purposes of ex post facto analysis. The Court stated, "The changes in the series of statutes authorizing the award of overcrowding gain-time, do not affect petitioner's core ex post facto claim. Petitioner could have accumulated gain-time under the emergency gain-time provision in much the same manner as he did under the provisional credits statute." Lynce, 519 U.S. at 449, 117 S.Ct. 891.
Prior to Lynce, the only relevant time frame for determining whether an inmate had an entitlement (under the Ex Post Facto Clause) to a certain benefit was the time of the offense. See Weaver v. Graham, 450 U.S. 24, 30, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981). Furthermore, if, at the time of the offense, the sought-after benefit was merely speculative, a retroactive change affecting that speculative benefit was not an ex post facto violation. See California Dept. of Corrections v. Morales, 514 U.S. 499, 509, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995).
Lynce has changed the nature of the ex post facto inquiry. Now, in addition to an examination of benefits available at the time of the offense, one must also examine subsequent time frames to see if a benefit which was previously possible, yet speculative, has now become more certain. See Lynce v. Mathis, 519 U.S. at 444-45, 117 S.Ct. 891. In Lynce's case, while the award of overcrowding credits was speculative at the time of the offense, after credits were actually awarded and he was released, they were no longer speculative. Id. at 446, 117 S.Ct. 891 (concluding that "unlike in Morales, the actual course of events makes it unnecessary to speculate").
Under this new approach, however, one must continue to look at the time of the offense to see if the receipt of a certain benefit was even possible (i.e., whether the inmate could have had any "expectation"). If, at the time of the offense, the inmate could not have even contemplated receiving the benefit, he could not have had any "expectation" at all under the Ex Post *1033 Facto Clause. For example, if an inmate's offense was committed before the first overcrowding statute was enacted in 1983, receipt of the overcrowding credit could not possibly have been contemplated at the time of the offense, and regardless of whether the inmate actually received the benefit later, he would have no ex post facto entitlement under the analysis in Lynce.
We believe Jones' case presents the above scenario because, contrary to Lynce's case, at the time of Jones' offense in 1982, there was no prison overcrowding statute in effect. See § 944.598(c), Fla. Stat. (1983). Therefore, since ex post facto entitlement still depends upon what an inmate was eligible for or could have contemplated at the time of the offense, we conclude that there is no ex post facto violation in Jones' case.
In Lynce, the United States Supreme Court specifically raised the possibility that the cancellation of some Provisional Credits may not have violated the Ex Post Facto Clause. "If the prison population did not exceed 98% of capacity between 1988 and 1992," the Court stated, "and if petitioner received provisional credits during those years, there is force to the argument that the cancellation of that portion of the [credits] did not violate the Ex Post Facto Clause." Lynce, 519 U.S. at 449, 117 S.Ct. 891. Based on this statement, the Department of Corrections concludes that Meadows and Meola are not entitled to restoration of their credits.
Meola and Meadows committed their offenses between June 2, 1986, and February 4, 1987. At that time, neither the Administrative Gain Time nor the Provisional Credits statutes were in existence. The first overcrowding statute (Emergency Gain Time) was, however, in effect. See § 944.598, Fla. Stat. (Supp.1986). That statute had a triggering percentile point (or threshold) of 99% prison capacity during the period of time in which Meola and Meadows committed their offenses. Meola and Meadows actually received Provisional Credits under a subsequently enacted statute that had a threshold point of 97.5% and 98% during the time in which they received the credits. Prison capacity never exceeded 99% capacity during the period of time in which Provisional Credits were awarded. At the time of their offenses, Meola and Meadows could only have contemplated receiving overcrowding credits if prison capacity had exceeded the threshold of 99% (which was the threshold at the time of their offenses). That did not happen during the period in which such credits were being awarded. Therefore, Meola and Meadows have no entitlement to the restoration of those credits under the Ex Post Facto Clause.[5]
In Waldrup v. Dugger, 562 So.2d 687 (Fla.1990), this Court considered the retroactive application of a 1983 gain time statute to inmates who had committed their offenses prior to the enactment of the statute. The Court held that the Department of Corrections could apply the advantageous portions of the gain time revisions retroactively, but that it could not apply the disadvantageous portions retroactively. *1034 On rehearing, the department asked this Court whether, for ex post facto purposes, it was required to apply the advantageous portions of the new statute to inmates who had committed their offenses prior to the revisions. This Court found that such offenders were not entitled to relief under the more generous amendments, stating that "inmates have no absolute right to avail themselves of a separate, intervening gain-time statute that is more lenient than both the statute in effect at the time of the offense and the one presently in effect." Waldrup, 562 So.2d at 695. Similarly, although all three petitioners received Provisional Credits at the later 97.5% and 98% thresholds, they had no ex post facto entitlement to the benefits of those later statutes because they were also part of a "separate, intervening gain-time statute that [was] more lenient than both the statute in effect at the time of the offense and the one presently in effect." Id. Accordingly, we conclude that there is no ex post facto violation in any of the three petitioners' cases.
The petitioners also allege that cancellation of their Provisional Credits constitutes a taking of their liberty interests without due process of law. Whether a prisoner has a reasonable expectation of liberty (a "liberty interest") depends upon whether some parole-type statute provides the prisoner with such an "expectation." See Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)(modifying standard to limit creation of such interests as concerns an inmate's freedom within the prison); Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). If that statute does provide the inmate with a liberty interest, that interest may only be taken "with due process."
There is relatively little caselaw concerning whether an overcrowding credits statute may create a reasonable expectation of liberty. There is, however, substantial caselaw concerning such interests as concerns parole. In Florida, parole-eligible inmates do not have a legitimate expectation of liberty or right to expect release on a certain date even after they have been given a specific Presumptive Parole Release Date (PPRD). Staton v. Wainwright, 665 F.2d 686 (5th Cir.1982). The PPRD is only an estimated release date. The Parole Commission reserves the right (and the duty) to make the final release decision when the PPRD arrives. Then and only then must the Commission determine whether the inmate meets the "probable law-abiding citizen" test specified in section 947.18, Florida Statutes (1997). If the Commission cannot find that there is a reasonable probability that, if released, the inmate would abide by the law and not be a threat to society, the Commission must deny the inmate release. See Florida Parole & Probation Comm'n v. Bruce, 471 So.2d 7 (Fla.1985); Florida Parole & Probation Comm'n v. Paige, 462 So.2d 817 (Fla.1985).[6]
Nevertheless, once an inmate has actually been awarded early release credits, it is reasonable to ask whether an inmate should feel secure in knowing that he or she may "keep them." As concerns a parole date, the statute itself makes clear that the giving of this "potential liberty interest" (the PPRD date) is not absolute.[7] In other words, the parolee may not "count on it." An examination of the Provisional *1035 Credits statute, however, reveals that there was no "final review" made to determine whether, once the release date arrived, the inmate would actually be released. See § 944.277, Fla. Stat. (1991). Nothing in the Provisional Credits statute indicates that, even after the credits had been given (but before release) retention of the credits was somehow contingent or provisional upon some later-occurring action. Accordingly, we conclude that the Provisional Credits statute itself provided the petitioners with a liberty interest which could not be taken without due process.
The Due Process Clause guarantees that a person is entitled to a "fair procedure" to determine the basis for, and legality of governmental action when such action deprives a person of a protected interest. See John E. Nowak, et al., Constitutional Law § 13.1, at 452 (3d ed.1986). While both the Florida Constitution and the Constitution of the United States of America provide for an outright prohibition against ex post facto laws,[8] the provisions concerning due process do not prohibit the taking of liberty (or a liberty interest); they only require that such takings be done by "due process of law."[9] Furthermore, due process is flexible. It only calls for such procedural protections as the particular situation demands. See Morrissey, 408 U.S. at 481, 92 S.Ct. 2593. In Herring v. Singletary, 879 F.Supp. 1180 (N.D.Fla.1995), the United States District Court for the Northern District of Florida discussed Florida's cancellation of Provisional Credits. That court concluded that since the credits were canceled by a statute affecting a whole class of individuals, due process of law was properly accorded by means of legislative action.[10] That court stated:
The credits were cancelled by statute. The enactment of a statute affecting liberty or property interests does not implicate procedural due process because the legislative process itself provides all of the process that is due. Logan v. Zimmerman Brush Co., 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982).
Herring, 879 F.Supp. at 1185 (emphasis added). We agree with the District Court and find nothing in the Due Process Clause requiring that due process be confined to either the judicial branch or the executive branch. As the United States Supreme Court has stated:
The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in *1036 the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.
Bi-Metallic Investment Co. v. State Bd. of Equalization, 239 U.S. 441, 445, 36 S.Ct. 141, 60 L.Ed. 372 (1915).
As the District Court recognized in Herring,[11] this Court has already determined that across-the-board legislative cancellations eliminate any question of arbitrariness or any need for individual proceedings. See Langley v. Singletary, 645 So.2d 961 (Fla.1994); Griffin v. Singletary, 638 So.2d 500 (Fla.1994). While we acknowledge that Lynce has essentially overruled our previous decisions in this area as concerns the Ex Post Facto Clause, we find no indication in Lynce that we must now also recede from our earlier conclusions regarding due process.[12] In Langley, we discussed the reasons for the across-the-board cancellations taken pursuant to section 944.278 and found those reasons to be adequate. We stated:
[A]dministrative gain time and provisional credits were temporary devices for achieving federally mandated reduction in prison overcrowding. The legislature now has determined that the problem has lessened and that other devices are available that render administrative gain time and provisional credits redundant or unnecessary. These devices include increased building of prisons, front-end diversionary programs, and certain other early release programs.
Langley, 645 So.2d at 961. In Griffin v. Singletary, 638 So.2d 500 (Fla.1994), we determined that there was no violation of due process when the legislature canceled credits for inmates (such as Meola and Jones) convicted of especially serious crimes in order to protect society. We reaffirm our previous decisions in Langley and Griffin as to our discussion of due process. We believe that the State has a legitimate interest in seeing that prisoners serve their sentences and that only the least dangerous inmates are released early when prison overcrowding reaches crisis proportions. Accordingly, while we agree that prisoners did have a legitimate liberty interest in Provisional Credits after having been awarded such credits, since the "taking" was not done only against one individual, but rather, against all similarly situated prisoners, the legislative process provided sufficient due process of law.[13] While inmates who had received these credits may legitimately complain that they believed they could keep the credits, these expectations must be balanced against the legitimate security expectations of the public and its legislators. We conclude that the legislature's determination that public security concerns out-weighed inmate expectations was reasonable. Since the "rational basis" test is really just another way of saying that the State had a legitimate reason for acting and that its actions were a reasonable means to achieve the desired result, we *1037 conclude that the State has met that test.[14]
Petitioner Meola also alleges that it is a violation of equal protection to restore credits to some inmates but not to other inmates. The Equal Protection Clause, however, does not demand that all persons be treated equallyit demands only reasonable conformity in dealing with persons similarly situated. See City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Different treatment of dissimilarly situated persons does not constitute an equal protection violation. E & T Realty v. Strickland, 830 F.2d 1107, 1109 (11th Cir.1987), cert. denied, 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). Meola is not similarly situated to those inmates whose credits were restored. He is not similarly situated because, contrary to the situation with those inmates whose credits were restored, when Meola committed his offense the relevant overcrowding statute had a prison overcrowding threshold of 99% and prison overcrowding never reached that threshold during the years in which those credits were being awarded. Accordingly, there is no equal protection violation. For the foregoing reasons, therefore, we deny all three petitions.
It is so ordered.
OVERTON and SHAW, JJ., concur.
WELLS, J., concurs in result only.
KOGAN and ANSTEAD, JJ., dissent.
PARIENTE, J., recused.
NOTES
[1] We are simultaneously releasing three other opinions which also concern overcrowding credits (either Emergency Gain Time, Administrative Gain Time, Provisional Credits, Control Release, or all four programs). While each of these opinions are similar because they discuss the effect that the United States Supreme Court's decision in Lynce v. Mathis has had on gain time caselaw, they are different in several ways.

Gomez v. Singletary, 733 So.2d 499 (Fla. 1998), addresses gain time in the context of prisoners who were never awarded certain types of credits but should have been awarded such credits. It holds that the subsequent revisions in the prison overcrowding statutes which effectively made the petitioners ineligible to receive any credits constituted an ex post facto violation.
State v. Lancaster, 731 So.2d 1227 (Fla. 1998), addresses gain time in the context of prisoners who had their Administrative Gain Time or Provisional Credits forfeited upon revocation of probation. It holds that the State has statutory authority to forfeit their credits, but only for offenses committed after a certain date and that the 1993 statute called the Safe Streets Initiative cannot be used to cancel their gain time as concerns inmates who were released on supervision before its enactment.
Thomas v. Singletary, 729 So.2d 369 (Fla. 1998), addresses the extension and then cancellation of prisoners' release dates under the Control Release program. It holds that since inmates were always on notice that their control release dates could be changed to a later date, the legislative amendments to the program and, ultimately, the cancellation of their release dates did not result in an ex post facto violation.
Some of the petitioners who in this case (Meola) have received no relief may potentially receive some relief under Gomez.
[2] Jones has advised this Court that he is no longer in the custody of the Florida Department of Corrections. Thus, technically, his petition could be considered moot. However, mootness does not destroy a court's jurisdiction when, as here, the questions raised are of great public importance or are likely to recur. See Holly v. Auld, 450 So.2d 217 (Fla.1984).
[3] The provision which caused the loss of Meola's and Jones' eligibility was the same offense-based retroactive ineligibility provision that was the subject of Lynce v. Mathis, 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997).
[4] See ch. 93-406, § 35, Laws of Fla. The same act also repealed the Provisional Credits statute (section 944.277). See ch. 93-406, § 32, Laws of Fla.
[5] The inmate in Lynce fell under the Emergency Gain Time statute as originally enacted in 1983 since his offense was committed on October 27, 1985. That version had a threshold of 98%. See § 944.598, Fla. Stat. (1983); ch. 83-131, § 5, Laws of Fla. Meadows and Meola, on the other hand, fall under the Emergency Gain Time statute as amended on June 2, 1986, since their offenses were committed between June 2, 1986 and February 4, 1987. The version in effect at that time had a threshold of 99%. See § 944.598, Fla. Stat. (Supp.1986); ch. 86-46, § 1, Laws of Fla. The decision in Lynce indicated that the change in the threshold in the Emergency Gain Time statute was raised from 98% to 99% in 1987. See Lynce, 519 U.S. at 437-38, 117 S.Ct. 891. In actuality, that change took place on June 2, 1986. See § 944.598, Fla. Stat. (Supp.1986); ch. 86-46, § 1, Laws of Fla. The Court also indicated that the Provisional Credits statute (always) had a threshold of 97.5%. The threshold for Provisional Credits was raised to 98% on September 1, 1990. See § 944.278 (Supp.1990); ch. 89-526, §§ 5, 52, Laws of Fla.
[6] However, once the inmate has actually been granted parole, then the inmate clearly has a legitimate liberty interest which may not be taken without an individualized due process hearing. See Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In addition, the United States Supreme Court recently extended this principle to the situation in which an inmate had actually been given release under a prison overcrowding statute and then rearrested. See Young v. Harper, 520 U.S. 143, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997) (concerning Oklahoma's overcrowding reduction program).
[7] See §§ 947.002(2), 947.165, 947.172, 947.173, 947.174, 947.1745, 947.1746, Fla. Stat. (1995).
[8] Article I, section 10 of the Florida Constitution provides:

Prohibited Laws.No bill of attainder, ex post facto law or law impairing the obligation of contracts shall be passed.
Article I, section 10 of the Constitution of the United States of America provides, in pertinent part:
No State shall ... pass any Bill of Attainder [or] ex post facto Law....
[9] Article I, section 9 of the Florida Constitution provides:

Due Process.No person shall be deprived of life, liberty or property without due process of law....
The Fifth Amendment to the Constitution of the United States of America further provides, in pertinent part:
No persons shall be ... deprived of life, liberty, or property, without due process of law....
Section 1 of the Fourteenth Amendment to the Constitution of the United States of America further provides, in pertinent part:
[N]or shall any State deprive any person of life, liberty, or property, without due process of law....
[10] The District Court also found no violation of ex post facto concerning factual circumstances nearly identical to those present in Lynce. While, certainly, the court's conclusions as to any ex post facto violation are no longer good law after the decision in Lynce, we find nothing in Lynce which might indicate that Lynce has changed due process analysis as well.
[11] See Herring, 879 F.Supp. at 1185.
[12] In Griffin, we discussed both the Ex post Facto Clause and the Due Process Clause. In Langley, we only discussed the Due Process Clause.
[13] This is contrasted to the case in which an individual's actual liberty is taken, such as when an individual's parole is revoked after having been released. In that case, the government is not acting against a whole group of people, it is acting against one person and thus, due process must be more individual. When the government through the legislature acts against a whole class of people, the people as a whole have the ability to remedy the situation by approaching their lawmakers, electing other more desirable lawmakers, circulating petitions, etc. In other words, other due process options are available. This would seem appropriate because due process is only "a meaningful opportunity to be heard," not an absolute bar against government action. See generally Boddie v. Connecticut, 401 U.S. 371, 377, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).
[14] In fact, the legislature's actions would conceivably withstand even the more rigorous "strict scrutiny" test since protection of society easily could constitute a "compelling governmental interest."