831 So.2d 63 (2002)
Mark D. WINKLER, Petitioner,
v.
Michael W. MOORE, etc., et al., Respondents,
Christopher Hall, Petitioner,
v.
Michael W. Moore, etc., et al., Respondents,
James Cross, Petitioner,
v.
Michael W. Moore, etc., et al., Respondents.
Nos. SC93294, SC94507, SC00-614.
Supreme Court of Florida.
April 25, 2002.
Rehearing Denied September 25, 2002.
*64 Baya Harrison, III, Monticello, FL, for Petitioners Winkler and Cross; Christopher Hall, pro se, Daytona Beach, FL, and John C. Schaible, Florida Institutional Legal Services, Inc., Gainesville, FL, for Petitioner Hall, Petitioners.
Susan A. Maher, Deputy General Counsel, and Judy Bone, Assistant General Counsel, Sheron L. Wells, Assistant General Counsel, and Kim M. Fluharty, Assistant General Counsel, Department of Corrections, Tallahassee, FL; and William L. Camper, General Counsel, and Bradley R. Bischoff, Assistant General Counsel, Florida Parole Commission, Tallahassee, FL, for Respondents.
PER CURIAM.
Mark D. Winkler and Christopher Hall petition this Court for writs of habeas corpus. James Cross petitions this Court for a writ of mandamus.[1] This Court has consolidated their cases and hereby denies Winkler's and Hall's petitions in full, and denies Cross's petition in part and grants it in part as further set forth below.

*65 BACKGROUND
In Gomez v. Singletary, 733 So.2d 499 (Fla.1998), this Court addressed gain time in the context of prisoners who were never awarded certain types of overcrowding credits[2] but should have been awarded such credits. This Court held that the subsequent revisions in the prison overcrowding statutes which effectively made the petitioners ineligible to receive any credits constituted an ex post facto violation. In that case, the Florida Department of Corrections (hereinafter the Department) provided proposed relief charts for six "Offender Groups" which were groups of inmates categorized by offense type, program eligibility, and offense date.[3] Only three groups (Groups 3, 4 and 5) were actually represented by a petitioner in Gomez, and therefore this Court declined to address the other groups (1, 2, and 6). Now that petitioners representing the remaining groups are before this Court, we hereby set forth the overcrowding gain time awards for the three remaining groups as well. Further, as a means of finalizing and setting forth the proper Gomez awards for all groups, the appendices to this opinion (A and B) contain charts for determining the proper overcrowding awards for all six groups.

PETITIONER WINKLER: OFFENDER GROUP
Petitioner Winkler was convicted of three counts of DUI manslaughter and one count of leaving the scene of an accident involving death. The offenses were committed on April 9, 1985. At the time of his offenses, Winkler was eligible for emergency gain time. The Department never awarded any emergency gain time to any inmates prior to Gomez. Instead, and as set forth in Gomez, it utilized a series of new overcrowding gain time statutes. Each new statute essentially superseded the previous one. Winkler was awarded credits under all the programs enacted after emergency gain time. Thus, he received 720 days of administrative gain time and 1,860 days of provisional credits and when the Department stopped awarding provisional credits in 1991, the Florida Parole Commission began awarding him control release credits. In 1993, the Legislature canceled all administrative gain time and provisional credits but Winkler retained his control release eligibility. Eventually, however, due to the reduction in prison overcrowding, all of Winkler's control release credits were canceled. In 1997, the United States Supreme Court ruled in Lynce v. Mathis, 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997), that the State had violated the Ex Post Facto Clause when it retroactively canceled overcrowding gain time because such credits, like regular gain time, were subject to ex post facto analysis. The decision essentially overruled this Court's previous decisions holding that overcrowding gain time was not subject to ex post facto analysis. *66 See, e.g., Blankenship v. Dugger, 521 So.2d 1097 (Fla.1988); Dugger v. Rodrick, 584 So.2d 2 (Fla.1991); Griffin v. Singletary, 638 So.2d 500 (Fla.1994).
In December of 1998, this Court concluded in Thomas v. Singletary, 729 So.2d 369 (Fla.1998), that while the cancellation of control release credits did not violate the Ex Post Facto Clause, inmates were entitled to receive credits under the other overcrowding statutes in effect at the time of their offenses (emergency gain time, administrative gain time or provisional credits). See Gomez v. Singletary, 733 So.2d 499 (Fla.1998).
Nevertheless, the Department determined that Winkler would not have received any credits because he was a Group 1 Offender. The Department contended that Group 1 Offenders were not entitled to the restoration of any credits because, at the time of these inmates' offenses, the emergency gain time statute was the only overcrowding statute in effect, and it authorized the award of credits only when the inmate population exceeded 98% of "lawful capacity." Under the definition of "lawful capacity" in effect at the time of these prisoners' offenses, that threshold was not met.[4] Winkler contested this determination, asserting that the retroactive cancellation of Winkler's already awarded early release credits violated Ex Post Facto and Due Process Clauses of both the United States Constitution and the Florida Constitution.
We conclude that even if some members of Offender Group 1 actually received overcrowding credits, they had no real entitlement to such credits under the Ex Post Facto Clause based on the underlying reasoning of this Court's decisions in Gomez and Meola v. Department of Corrections, 732 So.2d 1029 (Fla.1998). This Court, relying on and interpreting the United States Supreme Court's decision in Lynce, explained in Gomez that one must look to the statute in effect on the date of the inmate's offense to see what ex post facto entitlement each inmate might have. Inmates who were awarded credits under the provisional credits statute but whose offenses occurred prior to the effective date of any of the prison overcrowding statutes (i.e., prior to June 15, 1983) actually had no ex post facto entitlement to the credits they received. Petitioner Jones in Meola was an example of such an offender, and this Court ruled that the Department did not have to restore his credits.[5] Similarly, this Court also found that inmates who offended when the emergency gain time statute had a triggering threshold of 99% of "lawful capacity" (June 2, 1986-February 4, 1987), were not entitled to restoration of their administrative gain time or provisional credits under Lynce because the prison population did not reach that threshold when credits were being awarded. See Meola, 732 So.2d at 1033-34.
Similarly, Group 1 Offenders were not and are not entitled to credits because the prison population did not exceed the relevant prison overcrowding percentile threshold. That threshold is determined based on the emergency gain time statute as it existed from its effective date in 1983. *67 See § 944.598, Fla. Stat. (1983). While the definition of "lawful capacity" was 133% of design capacity for the Offender Groups (3-5) discussed in Gomez, see Gomez, 733 So.2d at 507-508, for Group 1 Offenders, the definition was different. "Lawful capacity" was defined as "the total capacity of all institutions and facilities in the prison system as determined either by the Legislature or by the courts." See § 944.598(7)(b), Fla. Stat. (1983) (emphasis added). The Legislature did not determine what was meant by the term until 1992. Any earlier effective date could only have been determined by a court. The court made such a determination in the settlement agreement executed in the landmark prison overcrowding case of Costello v. Wainwright, 489 F.Supp. 1100 (M.D.Fla.1980). Under that agreement, the Department was given until July 1, 1985, to attempt to reduce prison overcrowding before the Legislature's definition of "lawful capacity" as 133% of design capacity would go into effect. The definition of lawful capacity was not set until July 1, 1985. Therefore, no definitive and unlawful overcrowding could occur prior to that date.[6] Prior to July 1, 1985, the 1983 emergency gain time statute became effective and provided for the award of credits when prison overcrowding exceeded 98% of "lawful capacity." No such credits, however, could be awarded because there was no judicial or legislative definition of "lawful capacity"; prison overcrowding could not be determined based on an undefined level. In other words, while there might have been some overcrowding, there could be no unlawful overcrowding until at least July 1, 1985. Before this date, the Department was not restricted under ex post facto principles in determining how many inmates it could house regardless of how the Department chose to define "lawful capacity."[7]
Winkler also claims his ex post facto rights have been violated because his credits were "retrospectively" canceled. In so arguing he attempts to redefine the term "retrospective." He asserts that, since he received overcrowding credits but they were later taken away, the taking was an unlawful "retrospective" application of the law which violated ex post facto principles. The problem with this argument is that for ex post facto purposes the term "retrospective" has not been defined in the manner he suggests.
In Lynce, the United States Supreme Court explained that two critical elements must be present for a criminal or penal law *68 to violate ex post facto principles: (1) it must be retrospective, that is, "it must apply to events occurring before its enactment; " and (2) it must "disadvantage the offender affected by it." Lynce, 519 U.S. at 441, 117 S.Ct. 891 (quoting Weaver v. Graham, 450 U.S. 24, 29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981)) (emphasis added).
While there is no disagreement that gain time forfeitures result in a disadvantage to inmates by increasing the time they have to spend in prison, the question that is left to answer is what is the operative "event" under the first Lynce criterion. In order for Winkler to prevail on his ex post facto claim, this Court would have to accept Winkler's assertion of what "event" is used to trigger a retroactivity determination. Winkler argues the "event" is the act of giving Winkler overcrowding credits. Thus, he opines the law taking away his credits was applied retrospectively to or after the "event" of receiving the credits. However, as we have previously indicated, the appropriate "event" for ex post facto purposes is the commission of the offense and the rights the offender had on the date he or she committed the offense. That means, for example, that if at the time of the criminal offense, inmate A had a right to receive 20 days per month of gain time and then later the Legislature changed the gain time to five days per month and applied that change retrospectively to inmate A's earlier occurring offense (the relevant "event"), then there would be an ex post facto violation. That did not occur here. At the time of Winkler's offense, he was entitled to receive overcrowding credits if prison overcrowding exceeded 98% of "lawful capacity," which, as discussed above, did not occur. Winkler actually received credits under a more advantageous statute because he would not have received any credits under the statute in effect at the time of his offense. Therefore, even though he lost credits after receiving them, there is no constitutional violation because he lost something he had no right to receive at the time of his offenseand that is the relevant time-frame for ex post facto purposes. Accordingly, neither Winkler nor any of the members of Offender Group 1 are entitled to any credits under ex post facto principles.
Winkler's due process claim is controlled by this Court's decision in Meola v. Singletary, 732 So.2d 1029 (Fla.1998). There this Court found that, since none of the early overcrowding statutes provided for the cancellation of credits other than for certain specified misconduct, the petitioners had a reasonable expectation that they could keep the credits they had been awarded. That being the case, the State could not take the credits without providing due process. While balancing the expectations of the petitioners and the State's public security concerns, this Court determined that the legislative process had provided sufficient due process. Id. at 1036-37.[8] We conclude that the same *69 analysis should apply here. Thus, Group 1 Offenders are not entitled to any overcrowding credits under due process principles.
Based on the foregoing, we conclude that Winkler's petition for writ of habeas corpus should be denied in full.[9]

PETITIONER HALL: OFFENDER GROUP 2
Petitioner Hall is serving a 40-year sentence for two sexual batteries, several burglaries, and a robbery with a firearm, all occurring in the period from March 14, 1986, to March 30, 1986. When Hall entered prison he was not awarded any kind of overcrowding credits prior to the United States Supreme Court's decision in Lynce and this Court's decision in Gomez. After Gomez was issued, however, the Department reexamined his case and awarded him 330 days of emergency gain time as a Group 2 Offender.[10] Hall argues that he should be entitled to many more days of credits. We disagree.
Hall was eligible for emergency gain time credit when prison overcrowding exceeded 98% of "lawful capacity" with "lawful capacity" being defined as 133% of design capacity. As this Court explained in Gomez, the emergency gain time statute is different from the administrative gain time and provisional credits statutes because the number of emergency gain time awards is limited to a certain period of time. Hall was eligible for credits under the first version of the emergency gain time statute. That statute had two parts. The first part (phase I) provided for the *70 award of credits "across-the-board" to all inmates,[11] and the second part (phase II) provided for the award of credits to a different group of inmates if the limited awards available to the first group did not work to sufficiently reduce the level of prison overcrowding.[12] Under the statute, the first group could only receive a certain number of credits per overcrowding occurrence (phase I). If the inmate did not qualify for credits under phase II, the inmate was limited to the phase I awards. The Department's prison population records show that inmates eligible for awards under only phase I were entitled to 30-day awards eleven times between 1987 and 1995. This totals 330 days. Based on the length of Hall's sentence, he did not qualify for phase II awards; thus, he can only receive the 330 credits due under phase I. Therefore, phase I members (like Hall) who are Group 2 Offenders are entitled to only up to 330 days of emergency gain time (depending upon their disciplinary records) and since Hall was awarded 330 days, he has received all he is entitled to.
Hall also claims that he should be entitled to receive more than 330 days because the Department should not have been permitted to utilize later-enacted overcrowding statutes in order to let a different, less politically repugnant group of inmates out early. Essentially, he argues that the Legislature and the Department worked to keep sexual offenders, murderers, and other unpopular inmate groups from being released early by enacting and utilizing later-enacted statutes to release the less dangerous (less unpopular) inmates when prison overcrowding reached crisis proportions.
By making this argument, Hall overlooks the fact that this Court said in Gomez that the Legislature could take action to prevent overcrowding from reaching such high levels that the offenders thought to be more dangerous would have to be released under the earlier statute. As explained in Gomez, the Legislature succeeded for a number of years in keeping the 98% of "lawful capacity" threshold from being exceeded by releasing the less dangerous inmates through new programs. It was not until the Legislature failed to keep the thresholds from being triggered and then ignored the fact of overcrowding that any ex post facto violation occurred. The emergency gain time statute did not provide that if anyone was ever to be released early it had to be Hall and all those eligible under the original, less restrictive statute. That was not the contingency. The award of credits was based on the contingency of prison overcrowding surpassing the 98% threshold. The Legislature kept that contingency from occurring for a good number of years and even when it failed, it kept it from occurring as often as it might have occurred. This Court said in Gomez that there was nothing wrong with that action and we reaffirm that statement here today. Accordingly, we deny Hall's petition in full.

PETITIONER CROSS: OFFENDER GROUP 6
Petitioner Cross is serving a number of sentences that qualify for Offender Group 5[13] awards and a number of offenses *71 that qualify for Offender Group 6[14] awards. The offenses with the longest prison terms are considered the controlling offenses (since, of course, the inmate cannot be released before they end). Cross's controlling sentence qualifies for Offender Group 6 designation, and thus the award Cross receives as a Group 6 offender controls his release date.[15]
When Cross was sent to prison in 1993, he was statutorily eligible for control release consideration and when the Parole Commission first evaluated him for the program, it considered him a good candidate for possible early release. Thus, the Parole Commission placed him in the "advanceable pool," see Fla. Admin. Code R. 23-22.006(10)(b)-(c), and began awarding him control release credits. A few months after arriving in prison, however, Cross was returned to the circuit court for probation revocation proceedings regarding 1989 and 1990 cases for which he had been on probation prior to his 1993 return to prison. At those proceedings, the court revoked his probation (effective the date of the violation) and resentenced him in those cases. Upon his return from resentencing, the Parole Commission reassessed Cross's fitness for early release and determined that he was no longer a good release risk. See § 947.146(7)(a)1.e., Fla. Stat. (Supp. 1992). Accordingly, it established Cross's control release date as "Maximum Sentence Length Non Advanceable B." See Fla. Admin. Code R. 23-22.006(10)(a)2. This meant that his previously awarded control release credits were canceled and when subsequent credits were awarded, his release date was not reduced (i.e., it was not "advanced") because Cross was no longer in the "advanceable pool."
In early 1999, after this Court's decision in Gomez became final, the Department began auditing inmates' sentences to determine whether any Gomez credits were to be awarded. The Department determined that based on the time-frames in which he was in custody, Cross was entitled to 548 days of the 822 total possible days of provisional credits as to his Group 6 offenses. Cross was entitled to 357 days of the 1830 days total possible days of provisional credits as to his Group 5 offenses. Cross objected, arguing, inter alia, that the Department improperly made him ineligible to receive overcrowding credits for two months for each month in which he received a disciplinary report.
Cross admits he committed disciplinary infractions during four separate months and admits that for those months, he is not entitled to overcrowding credits. He is not entitled to these credits because under both the provisional credits statute and the administrative gain time statute, an inmate is not eligible for credits unless he is "earning incentive gain-time." See § 944.277(1), Fla. Stat. (Supp.1988) (the provisional credits statute); § 944.276, Fla. Stat. (1987) (the administrative gain time statute). The Department's rules (in effect when provisional credits were in effect) indicated that:
An inmate is not eligible to receive incentive gain time for the month in which there is an infraction of the rules of the *72 Department or the laws of the State for which he is found guilty.
See Fla. Admin. Code R. 33-11.0065(5)(a) (emphasis added) (now renumbered as rule 33-601.101(6)(a)). Rule 33-11.0065(3)(c) further clarifies the matter and provides:
As evaluations are based on activities for the month, no inmate shall be considered as earning incentive gain time until the month is complete, the evaluations have been submitted, and the award has been determined.
See Fla. Admin. Code R. 33-11.0065(3)(c) (now renumbered as rule 33-601.101(3)(c)).
We conclude, based on these rules, that the Department is justified in denying an inmate overcrowding credits when a disciplinary infraction is committed and it may wait until the month is over to award gain time. However, according to the Department's policy, it has taken the matter one step further: for each month in which a disciplinary infraction was committed, the Department has denied Cross (and apparently all inmates entitled to Gomez credits) overcrowding gain time eligibility for two monthsboth the month in which the disciplinary infraction was committed and the following month. While rule 33-11.0065(5)(a) (now renumbered as 33-601.101(6)(a)) has been amended to provide for subsequent ineligibility for up to six months following the month in which a disciplinary infraction occurs, the amended rule specifically provides that it only applies to inmates who are found guilty of committing a disciplinary infraction on or after April 21, 1996, and who are serving sentences imposed for offenses committed on or after October 1, 1995. Therefore, the amended rule would not apply to the disciplinary infractions at issue in this case.
While we completely understand that the Department might want to wait until the month is complete to award gain time, whether the penalty is taken in the first month or the subsequent month, under the rules pertinent to this case, if there is one month of misbehavior, there should be only one month of gain time ineligibility. That being the case, Cross is entitled to 405 days credits on his Group 5 offenses and 612 days credits on his Group 6 offenses.
Lastly, the Department and the petitioners assert that the first overcrowding statute should be considered to have gone into effect on June 15, 1983, despite the fact that this Court's charts in Gomez showed it as going into effect on June 16, 1983. They assert that they have essentially disregarded that part of the opinion because they believed it was a mistake and that it would cause too much upheaval, both to the Department and to the parties. The Department brought this issue to the Court's attention on rehearing in Gomez and, while we did not specifically address the matter in the opinion, we considered the issue and concluded that the Department's reliance upon an attorney general opinion was not correct. For that reason, the chart was published showing the first overcrowding statute going into effect on June 16, 1983.
We reiterate the determination made in Gomez that the statute became effective on June 16, 1983, when the bill was filed in the Office of the Secretary of State, not on June 15, 1983, when the Governor signed it. See State ex rel. Schwartz v. Bledsoe, 159 Fla. 243, 31 So.2d 457, 460 (1947) (holding that a bill becomes a law when "approved and signed by the Governor and by him filed in the office of the Secretary of State"). However, the parties agree on this issue and assert that a change would disadvantage numerous inmates as well as disrupt the entire system of calculating gain time since other gain time statutes were also enacted as a part *73 of the same act. We see no reason to disrupt this already established procedure of applying the statute retroactively by one day as the Department has done for nearly twenty years, so long as this application benefits the inmate population and decreases the upheaval already caused by Lynce. Therefore, we have changed the chart to indicate that we will treat the statute as if it had gone into effect on June 15, 1983.

CONCLUSION
Based on the foregoing we hereby deny Mark D. Winkler's and Christopher Hall's petitions for writ of habeas corpus. We hereby grant mandamus relief to James Cross to the extent that he is entitled to additional credits on his Group 5 offenses and his Group 6 offenses because the Department erroneously withheld overcrowding gain time credits for two months instead of one month.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.

*74
 Winkler Appendix A: Overcrowding relief programs  Dates  Thresholds
 Group 0* Group 1** Group2** Group3*** Group 4*** Group 5*** Group 6**
Petitioner Jones Petitioner Winkler Petitioner Hall Petitioner Gomez Petitioner Kivett Petitioner Hock Petitioner Cross
Pre-6/15/83 6/15/83-6/30/85 7/1/85-6/1/86 6/2/86-6/16/93 2/5/87-6/30/88 7/1/88-8/31/90 9/1/90-6/16/93
Offenders Offenders Offenders Offenders Offenders Offenders Offenders
No statute EGT at 98% of LC16 EGT at 98% of LC EGT at 99% of LC AGT at 98% of LC PC at 97.5% of LC PC at 98% of LC
 (Defin. 133% of (defin. 133% of (defin.133% of Design (defin. 133% of Design (defin. 133% of
 Design Cap.) Design Cap.) Cap.) Cap.) Design Cap.
Total Possible Relief: Total Possible Relief: Total Possible Relief: Total Possible Relief: Total Possible Relief: Total Possible Relief: Total Possible Relief:
0 Days 0 Days: 720 days 120 days 2,592 Days 1,830 Days 822 days
 Phase I: 330 Days
 Phase II17: 390 Days
Full Definitions of Offender Groups provided on last page of Chart.
* Group 0 was represented by Jones in ** Groups 3, 4 & 5 were represented *** Groups 1, 2, & 6 are represented
Meola v. Singletary, 732 So. 2d 1029 in Gomez v. Singletary, 733 So. 2d in current pending case  Winkler,
(Fla. 1998). (Fla. 1998). Hall, Cross v. Moore, SC93294,
 SC94507, SC00-614.
16LC means "lawful capacity."
17Most Group 2 Offenders, including petitioner Hall, will be eligible for only up to 330 days of credits
under Phase I. A Group 2 Offender is not eligible for additional awards under Phase II unless he/she is eligible
under subsection (3) of the Emergency Gain Time Statute. See § 944.598(3), Fla.Stat. (1983-Supp. 1992).

*75 Winkler Appendix A(continued):

Offender Group Definitions
Offender Group 0 (zero) includes offenders whose offenses were committed before the first overcrowding credits statute (the Emergency Gain Time statute) became effective on June 15, 1983, and were not eligible for Emergency Gain Time, Administrative Gain Time, Provisional Credits, or Control Release, or who lost the benefit of any or all of the above-referenced programs.
Offender Group 1 includes offenders whose offenses were committed on or after June 15, 1983, but before July 1, 1985, and who are eligible for Emergency Gain Time at 98% of "lawful capacity," with "lawful capacity" being undefined during such period, but who are not eligible for, or lost the benefit of Administrative Gain Time and/or Provisional Credits and/or Control Release.
Offender Group 2 includes offenders whose offenses were committed on or after July 1, 1985, but before June 2, 1986, and who are eligible for Emergency Gain Time, at 98% of "lawful capacity," with "lawful capacity" defined as 133% of design capacity, but who are not eligible for Administrative Gain time, Provisional Credits, or Control Release, or who lost the benefit of Administrative Gain time and/or Provisional Credits, and/or Control Release.
Offender Group 3 includes offenders whose offenses were committed on or after June 2, 1986 but before June 17, 1993, and who are eligible for Emergency Gain Time at 99% of "lawful capacity" with "lawful capacity" defined as 133% of design capacity, but who are not eligible for Administrative Gain time, Provisional Credits, or Control Release, or who lost the benefit of Administrative Gain Time and/or Provisional Credits, and/or Control Release.
Offender Group 4 includes offenders whose offenses were committed on or after February 5, 1987, but before July 1, 1988, and who are eligible for Administrative Gain Time at 98% of "lawful capacity," with "lawful capacity" defined as 133% of design capacity, but who are not eligible for, or lost benefit of Provisional Credits and/or Control Release.
Offender Group 5 includes offenders whose offenses were committed on or after July 1, 1988 but before September 1, 1990 (7/1/88-8/31/90) and who are eligible for Provisional Credits at the 97.5% threshold, but who are not eligible for Control Release.
Offender Group 6 includes offenders whose offenses were committed on or after September 1, 1990, but before June 17, 1993, and who are eligible for Provisional Credits at 98% of "lawful capacity," with "lawful capacity" defined as 133% of design capacity, but who are not eligible for, or lost the benefit of Control Release.

*76
 Winkler Appendix B: Overcrowding Awards Per Group
 (I) Represents awards made under section 944.598(2) [Phase I]
 (II) Represents awards made under section 944.598(3) [Phase II]
 Group 1 Group 2 Group 3 Group 4 Group 5 Group 6
 Effective (Emerg.GT) (Emerg.GT) (Emerg.GT) (Admin. GT) (Prov. Credits) (Prov. Credits)
 Date 98% 98% 99% 98% 97.5% 98%
 6/15/83-6/30/85 7/1/85-6/1/86 6/2/86-6/16/93 2/05/87-6/30/88 7/1/88-8/31/90 9/1/90-6/16/93
02/16/1987 10(II) 10(I)
02/26/1987 20(II) 20(II)
03/17/1987 15(II)
03/26/1987 15(II)
04/16/1987
04/24/1987
05/15/1987
05/26/1987
06/17/1987
06/26/1987
07/16/1987
07/28/1987
08/17/1987
08/27/1987
09/14/1987
09/22/1987

*77
09/29/1987
10/13/1987
10/22/1987
10/29/1987
11/12/1987
11/19/1987
12/09/1987
12/17/1987
12/28/1987
01/19/1988
01/28/1988
02/04/1988
02/17/1988
03/08/1988
03/14/1988
03/24/1988
04/12/1988
04/20/1988
04/27/1988
05/12/1988

*78
05/19/1988
05/26/1988
06/08/1988
06/23/1988
06/30/1988
07/14/1988 20
07/21/1988 20
08/09/1988 20
08/15/1988 20
08/23/1988 20
09/09/1988 20
09/21/1988 20
09/28/1988 20
10/12/1988 20
10/20/1988 20
10/27/1988 20
11/10/1988 20
11/18/1988 20
11/29/1988 20
12/14/1988 20

*79
12/20/1988 20
12/22/1988 20
12/29/1988 20
01/19/1989 20
01/26/1989 20
02/06/1989 20
02/16/1989 20
02/24/1989 20
03/10/1989 20
03/16/1989 20
03/22/1989 20
03/30/1989 20
04/18/1989 20
04/25/1989 20
04/28/1989 20
05/12/1989 20
05/18/1989 20
05/25/1989 20
06/07/1989 20
06/15/1989 20

*80
06/21/1989 20
06/28/1989 20
07/07/1989 20
07/17/1989 20
07/25/1989 20
07/31/1989 20
08/08/1989 20
08/22/1989 20
08/28/1989 20
09/07/1989 20
09/15/1989 30
09/25/1989 30
10/05/1989 30
10/18/1989 30
10/27/1989 30
11/16/1989 30(I) 30
12/07/1989 30(I) 30
12/14/1989 30(II) 30
12/26/1989 30(II) 30
01/10/1990 30

*81
01/26/1990 30(I) 30
02/08/1990 30
02/19/1990 30(II) 30
02/28/1990 30(II) 30
03/16/1990 30
03/28/1990 30
04/13/1990 30
04/26/1990 30(I) 30
05/11/1990 30(II) 30
05/24/1990 30(I) 30
06/14/1990 30(I) 30
06/27/1990 30(II) 30
07/09/1990 30(II) 30
07/26/1990
08/16/1990 30(I) 30
08/31/1990 30(II) 30
09/13/1990
10/05/1990 30(I) 30
10/19/1990 30(I) 30
11/08/1990 30(II) 30

*82
11/28/1990 30(I) 30
01/18/1991
06/30/1991 76
07/31/1991 109
10/31/1991 180
11/30/1991 172
04/30/1992 184
05/31/1993 220
06/30/1993 30(I) 40 40 40
07/31/1993 25(II) 16 16 16
08/31/1993 35(II) 51 51 51
09/30/1993 32 32 32
10/31/1993 36 36 36
11/30/1993 51 51 51
12/31/1993 56 56 56
01/31/1994 36 36 36
02/28/1994 46 46 46
03/31/1994 32 32 32
04/28/1994 30(I)
04/30/1994 34 34 34

*83
05/31/1994 30(II) 26 26 26
06/30/1994 30(II) 33 33 33
07/31/1994 28 28 28
08/31/1994 48 48 48
09/30/1994 30 30 30
10/31/1994 37 37 37
11/30/1994 42 42 42
12/31/1994 37 37 37
01/31/1995 37 37 37
02/28/1995 37 37 37
03/31/1995 37 37 37
06/30/1995 1
08/31/1995 20
09/30/1995 25
10/31/1995 20
11/30/1995 1
 Gomez Gomez Gomez Gomez Gomez Gomez
 Total Phase I - 0 Phase I - 330 Phase I - 40
 Phase II - 0 Phase II - 390 Phase II - 80 2,592 1,830 822

*84
 TOTAL 0 72018 120 2,592 1,830 822
POTENTIAL
 AWARDS
18Most Group 2 Offenders will be eligible for only up to 330 days of credits under Phase I. A Group 2
Offender is not eligible for additional awards under Phase II unless he/she is eligible under subsection (3) of the
Emergency Gain Time Statute. See § 944.598(3), Fla. Stat. (1983-Supp. 1992).

NOTES
[1] We have jurisdiction. See art. V, § 3(b)(8)(9), Fla. Const.
[2] For our purposes today, we will use the term "overcrowding credits" and "overcrowding gain time" interchangeably.
[3] For each group the Department provided criteria for membership as well as a specific number of days it planned to award each member for each month in which overcrowding surpassed the relevant triggering percentage threshold under each version of each statute. While this Court only specifically discussed and approved the proposed criteria and awards for Offender Groups 3, 4, and 5, the Department classified and placed inmates in all six Offender Groups and awarded them credits according to what it believed to be the underlying reasoning of Gomezthat inmates are entitled to receive overcrowding credits according to the program and version of that program in effect at the time of their offenses.
[4] The triggering threshold is the point in time at which the percentage of prison overcrowding exceeds a certain point. That certain point was first called "lawful capacity," and then later "total capacity." For each overcrowding program the Legislature provided for a different triggering threshold. Further, it changed the definition of "lawful capacity" and "total capacity" a number of times. All these variables have made the determination of inmate gain time awards very complicated.
[5] We refer to such offenders as Group 0 (zero) Offenders.
[6] As described by the court approving the settlement agreement, the terms of the agreement included the following provision:

The terms of the settlement agreement provide generally that ... the total number of inmates housed in the institutions under the control of the Department of Corrections will not exceed "design capacity" plus one-third... Although no interim timetable is specified, the settlement proposal provides that these conditions will be met no later than July 1, 1985.
Costello, 489 F.Supp. at 1102 (emphasis added).
[7] The Department asserts that the proper definition of "lawful capacity" for this Offender Group is "maximum capacity." It then provides voluminous charts setting forth, in great detail, exactly how many inmates per month could be housed in its facilities based on 98% of this "maximum capacity." Although the Department may have limited itself during this time-frame, neither the Legislature nor any court had done so, and therefore we decline to accept that definition. The Department's definition was apparently accepted by two district courts, however, see e.g., Leggett v. Moore 765 So.2d 258, 259 (Fla. 1st DCA 2000); Black v. Moore, 768 So.2d 1236, 1236-38 (Fla. 1st DCA 2000); Grant v. Singletary, 730 So.2d 805, 805-06 (Fla. 2d DCA 1999), and, therefore, to the extent those district court decisions conflict with this opinion, they are disapproved.
[8] This Court stated in Meola:

[T]his Court has already determined that across-the-board legislative cancellations eliminate any question of arbitrariness or any need for individual proceedings. See Langley v. Singletary, 645 So.2d 961 (Fla. 1994); Griffin v. Singletary, 638 So.2d 500 (Fla.1994). While we acknowledge that Lynce has essentially overruled our previous decisions in this area as concerns the Ex Post Facto Clause, we find no indication in Lynce that we must now also recede from our earlier conclusions regarding due process. In Langley, we discussed the reasons for the across-the-board cancellations taken pursuant to section 944.278 and found those reasons to be adequate. We stated: [A]dministrative gain time and provisional credits were temporary devices for achieving federally mandated reduction in prison overcrowding. The legislature now has determined that the problem has lessened and that other devices are available that render administrative gain time and provisional credits redundant or unnecessary. These devices include increased building of prisons, front-end diversionary programs, and certain other early release programs.
Langley, 645 So.2d at 961. In Griffin v. Singletary, 638 So.2d 500 (Fla.1994), we determined that there was no violation of due process when the legislature canceled credits for inmates (such as Meola and Jones) convicted of especially serious crimes in order to protect society. We reaffirm our previous decisions in Langley and Griffin as to our discussion of due process. We believe that the State has a legitimate interest in seeing that prisoners serve their sentences and that only the least dangerous inmates are released early when prison overcrowding reaches crisis proportions. Accordingly, while we agree that in Provisional did have a legitimate liberty interest in Provisional Credits after having been awarded such credits, since the "taking" was not done only against one individual, but rather, against all similarly situated prisoners, the legislative process provided sufficient due process of law. While inmates who had received these credits may legitimately complain that they believed they could keep the credits, these expectations must be balanced against the legitimate security expectations of the public and its legislators. We conclude that the legislature's determination that public security concerns outweighed inmate expectations was reasonable. Since the "rational basis" test is really just another way of saying that the State had a legitimate reason for acting and that its actions were a reasonable means to achieve the desired result, we conclude that the State has met that test.
Id. at 1036-37 (footnotes omitted).
[9] Offender Group 1 includes offenders whose offenses were committed on or after June 15, 1983, but before July 1, 1985, and who are eligible for emergency gain time at 98% of "lawful capacity," with "lawful capacity" being undefined during that period, and who are not eligible for, or lost the benefit of administrative gain time, provisional credits, or control release.
[10] Offender Group 2 includes offenders whose offenses were committed on or after July 1, 1985, but before June 2, 1986, and who are eligible for emergency gain time, at 98% of lawful capacity, with lawful capacity defined as 133% of design capacity, but who are not eligible for administrative gain time, provisional credits, or control release, or who lost the benefit of administrative gain time, provisional credits, or control release.
[11] The inmate had to be eligible for "regular" gain time. That meant that inmates with sentences of life imprisonment or death and those serving mandatory minimum sentences were not eligible for overcrowding credits.
[12] Phase II eligibility (section 944.598(3)) required that the offender be serving a sentence of three years or less (except those imposed under section 775.087 or section 893.135, Florida Statutes (1983)) and be within 60 days of release by parole, gain time or expiration of sentence.
[13] Group 5 includes offenders whose offenses were committed on or after July 1, 1988, but before September 1, 1990, and who are eligible for provisional credits at the 97.5% threshold, but who are not eligible for control release.
[14] Group 6 includes offenders whose offenses were committed on or after September 1, 1990, but before June 17, 1993, and who are eligible for provisional credits at 98% of "lawful capacity," with "lawful capacity" defined as 133% of design capacity, but who are not eligible for or lost the benefit of control release.
[15] Cross's cumulative 17 year prison term for burglary and dealing in stolen property is his controlling sentence.